**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

KEVEN M. SMITH, an individual, and
BISCAYNE AND ASSOCIATES,
INC., a Michigan corporation,

                Plaintiffs,

v.

ALTISOURCE SOLUTIONS,
S.À.R.L., a Luxembourg private limited
liability company, and ALTISOURCE
SOLUTIONS, INC., a Delaware
corporation,

                Defendants.

_____/

Case No. 2:16-cv-11503-MFL-DRG

Hon.  Judge Matthew F. Leitman


**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
<u>MOTION TO COMPEL ARBITRATION AND STAY THIS PROCEEDING</u>**

## **TABLE OF CONTENTS**

STATEMENT OF ISSUE PRESENTED .................................................................iii

TABLE OF AUTHORITIES ................................................................................iv

I. INTRODUCTION ......................................................................... 1

II. STATEMENT OF FACTS ............................................................. 2

    A. The Earn-out Payments depend on "Adjusted Revenue." .................... 2

    B. Section 2.5 of the PSA describes precisely how the EOPs are to be calculated and reported. .................................................. 2

    C. The PSA refers to arbitration in only two contexts, both which involve accounting calculations. ............................................ 4

    D. Smith never controlled MBSI's performance. ...................................... 5

    E. Altisource withheld the $933,000 Earn-out Payment based on an alleged "condition" not found in the PSA and an improper set-off. ...................................................................................... 5

    F. Altisource confirmed that it would not revisit its positions. ................ 7

    G. The Complaint does not dispute "Adjusted Revenue." ........................ 8

III. ARGUMENT ................................................................................. 8

    A. The Court must carefully interpret the language of the PSA. .............. 8

    B. Section 2.5 requires arbitration only of matters concerning the calculation of Adjusted Revenue and the corresponding EOP. .......... 10

    C. Altisource is attempting to improperly enlarge the scope of the arbitration provision simply by including things in the Earn-out Statement that should not have been included. ................................. 16

        1. The "budget" issue is not arbitrable. ....................................... 16

        2. The Mortgage Builder Tax Issue is not arbitrable. ................... 18

i

     D.     Altisource's contention that Counts IV and V are "within the scope of the arbitration agreement" is frivolous.................................. 23

     E.     The Court should not stay this action. ................................................. 24

IV.    CONCLUSION ............................................................................................. 25

## <u>STATEMENT OF ISSUE PRESENTED</u>

Should the Court compel arbitration of claims which do not fall within the scope of an arbitration provision?

Plaintiffs' answer:                          No

The Court should answer:                  No

# <u>TABLE OF AUTHORITIES[1]</u>

**Cases**

*CanCan Dev., LLC v. Manno*, 2011 WL 4379064 (Del. Ch. Sept. 21, 2011) .. 20, 24

*Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16 (2nd Cir. 1995) ......... 24

*Costello v. Patterson Dental Supply, Inc.*, 2007 WL 1041128 (W.D. Mich. Apr. 5, 2007)....................................................................................................... 15

*Delaware Parfi Holding AB v. Mirror Image Internet, Inc.,* 817 A.2d 149 (Del. 2002)................................................................................................. 9

*Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1 (1st Cir. 2004)passim

*Hodges v. MedAssets Net Revenue Sys., LLC*, 2008 WL 476140 (N.D. Ga. Feb. 19, 2008)........................................................................................ 12, 14, 15

*Irving v. EBIX, Inc.*, 2010 WL 3168429 (S.D. Cal. Aug. 10, 2010) ...................... 15

*James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76 (Del. 2006).................... 9

*Klay v. All Defendants,* 389 F.3d 1191 (11th Cir. 2004)........................................ 25

*Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393 (Del. 2010) ........... 9

*Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728 (Del. 2006) ............... 9

*Medicis Pharm. Corp. v. Anacor Pharm., Inc.*, 2013 WL 4509652 (Del. Ch. Aug. 12, 2013)................................................................................................ 1, 9

*Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498 (2007) ................................... 9

*Preferred Landscape & Lighting, LLC v. Alban*, 2015 WL 9182581 (N.D. Ill. Dec. 17, 2015) ........................................................................................... 10, 16

*PureWorks, Inc. v. Unique Software Sols., Inc.*, 554 F. App'x 376 (6th Cir. 2014)........................................................................................................... 20, 21

---

[1] In accordance with the Court's Practice Guidelines, Plaintiffs will provide the Court with a binder containing the main cases in support of their legal positions.

*Seaford Assocs. Ltd. P'ship v. Subway Real Estate Corp.,* 2003 WL
    21254847 (Del. Ch. May 21, 2003).................................................................. 17

*Senti v. Sanger Works Factory, Inc.*, 2007 WL 1174076 (M.D. Fla. Apr. 18,
    2007)................................................................................................................. 16

*SLMSoft.Com, Inc. v. Cross Country Bank*, 2003 WL 1769770 (Del. Super.
    Ct. Apr. 2, 2003)............................................................................................... 17

*Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp*., 559 U.S. 662 (2010) ....................... 8

*Stoltz Realty Co. v. Paul,* 1995 WL 654152 (Del. Super. Sept. 20, 1995).............. 17

*T.R. McClure & Co., Inc. Liquidating Trust v. TMG Acquisition Co*., 1999
    WL 692683 (E.D. Penn, Sept. 7, 1999)............................................................. 15

*Viacom Int'l, Inc. v. Winshall*, 2012 WL 3249620 (Del. Ch. Aug. 9, 2012)..... 20, 24

# I.   INTRODUCTION

This case is one of many in recent history in which parties to a purchase agreement dispute whether an arbitration clause in an earn-out provision is limited to disputes about the *calculation* of earn-out payments, or whether it encompasses any and all disputes that even tangentially *relate* to or could affect earn-out payments. Each case turns on the particular contractual language at issue and the nature of the claims asserted, as prior cases make clear. Altisource places too much weight on statements that courts "favor" arbitration and must construe the disputed provision as "broadly as possible." Dkt. 7, p. 3. Policy arguments only go so far. Arbitration must be consensual. "Arbitration is a creature of contract and contract language controls above all else."[2] Thus, "a party attempting to invoke arbitration will not prevail by reciting the message that courts favor arbitration when the contract language they rely on does not demonstrate the parties' intent to submit the dispute in question to arbitration." *Id.*

Here, the language of the parties' Purchase and Sale Agreement ("PSA") demonstrates that the parties agreed to arbitrate only disputes about the calculation of the Earn-out Payment ("EOP"), not all disputes "regarding" the EOP or things that could affect the EOP. Here, whether an EOP is due depends on "Adjusted Revenue," and Altisource's calculation of "Adjusted Revenue" for the First Period

---

[2] *Medicis Pharm. Corp. v. Anacor Pharm., Inc*., 2013 WL 4509652, at *9 (Del. Ch. Aug. 12, 2013).

1

results in an EOP of $933,000. Altisource unilaterally included in its Earn-out Statement ("EOS") two alleged reasons for withholding the EOP that are not properly considered in connection with the calculation of the Earn-out under the PSA, and which do not justify Altisource's non-payment. In so doing, Altisource seeks to broaden the actual language of the arbitration provision to sweep claims under it that the parties never agreed to arbitrate. This is improper.

## II.   STATEMENT OF FACTS

### A.   The Earn-out Payments depend on "Adjusted Revenue."

Plaintiff Keven Smith ("Smith") was the owner, President, and CEO of Mortgage Builder Software, Inc. ("MBSI"),[3] a developer and licensor of loan origination software to lenders. On July 18, 2014, Plaintiffs and Altisource entered into the PSA, pursuant to which Altisource agreed to pay cash at closing plus Earn-out Payments ("EOPs") of up to $7.0 million depending on "Adjusted Revenue" in each of the three years after closing. (**Ex. 1**, §2.5(a)). In addition, on March 19, 2015, the parties entered into a First Amendment to the PSA, pursuant to which Altisource was to remit certain "Aged Receivables" to Biscayne. (**Ex. 2**).

### B.   Section 2.5 of the PSA describes precisely how the EOPs are to be calculated and reported.

The method for calculating the EOPs is important to this dispute. Section 2.5 states that "[t]he Earn-out Payments shall be *calculated* as follows . . . ." (Ex. 1, p.

---

[3] After the sale, Smith formed an entity called Biscayne & Associates, Inc. ("Biscayne"), which is the "Seller" under the PSA and a Plaintiff.

5, emphasis added). According to Section 2.5(a)(i):

> Purchaser shall *calculate* the *Adjusted Revenue* during such Measurement Period . . . *in the event that the Adjusted Revenue equals an amount set forth in the left-hand column of the chart attached hereto as Annex II*, *then Seller shall be entitled to* an aggregate Earn-out Payment equal to the amount set forth in the corresponding row in the right-hand column . . . [*Id*. (emphasis added)].

"Adjusted Revenue" is "(A) the Revenue of the Acquired Business; (B) the Pull Through Revenue; Plus (C) deferred revenues as of the last day of the Measurement Period; minus (D) deferred revenues as of the first day of the Measurement Period; and (E) bad debt expense during the Measurement Period; in each case as determined in accordance with GAAP." (Ex. 1, Definitions, ¶ 4).

Section 2.5(c) also specifies when and in what manner Altisource is to notify Biscayne of "Adjusted Revenue" and of any corresponding EOP. It states:

> each Purchaser shall . . . conduct a financial review of Seller, and in connection with such review, shall *prepare a statement of the Adjusted Revenue during such Measurement Period, and if applicable, a statement calculating the Earn-out Payment* payable with respect to such Measurement Period (the **"Earn-out Statement"**). Promptly after completion of the review and the preparation of the Earn-out Statement, each Purchaser shall deliver to Seller a copy of the Earn-out Statement *together with copies of such computations and all reasonable supporting documentation* . . . . [Ex. 1, ¶ 2.5(c), emphasis added]

Section 2.5(d) was amended in January during discussions to resolve this dispute. Pursuant to the amendment, the EOS becomes final on the first day after notice from Biscayne that Biscayne agrees with the statement, or, alternatively, on the thirty-first day after delivery of notice that discussions to resolve any disputes

3

are terminated by way of a "Notice of Disagreement Deadline," unless Biscayne delivers a "Notice of Disagreement" before such time. (**Ex. 3**).

Section 2.5(f) describes how disputes regarding the calculations in the EOS that are specified in a Notice of Disagreement are to be resolved. In particular, Section 2.5(f) speaks to any "differences which [the parties] may have with respect ***to the matters specified in such Notice of Disagreement with Earn-out Statement***." (Ex. 1, §2.5(f), emphasis added). If differences with respect to "the matters specified in such Notice of Disagreement with Earn-out Statement" have not been resolved by the end of a 30-period, "each Purchaser and Seller shall submit to the Arbitrator . . . any and all matters which remain in dispute and ***which were included in any Notice of Disagreement with Earn-out Statement*** . . . ." *Id*. The "Arbitrator" is defined as the Boston office of Ernst & Young. (Ex. 1, § 2.4).

### C. The PSA refers to arbitration in only two contexts, both which involve accounting calculations.

There is no blanket arbitration provision in the PSA that requires arbitration of all claims arising under the PSA. Rather, the PSA refers to arbitration in only two, specific locations, both which deal with accounting issues – Section 2.5 (discussed above) and Section 2.4, which provides procedures for purchase price adjustments. Section 2.4 provides that Altisource was to deliver to Plaintiffs "a separate statement showing any ***calculations*** with respect to any necessary Price Adjustment (the "Final Adjustment Schedule")." (Ex. 1, § 2.4(b)(ii), emphasis

4

added). Biscayne could then accept or reject the calculation. Section 2.4 contains an accountant arbitration provision that parallels Section 2.5(f). (Ex. 1, § 2.4(c)).

### D.     Smith never controlled MBSI's performance.

The transaction closed on or about September 12, 2014. Contemporaneously with the closing, ASI and Smith entered into an Employment Agreement dated September 12, 2014, pursuant to which Smith became employed by ASI to perform certain services to the new MBSI division of Altisource but remained subject to Altisource's direction. (**Ex. 4**). Within the first year after closing, Altisource installed its own executives. Smith and ASI mutually agreed to change Smith's status from an employee to a consultant and entered into a Separation Agreement and a separate Transition and Consulting Agreement (the "TCA") dated May 7, 2015. (**Ex. 5**). Under the TCA, Smith was to be available to Altisource to provide consulting services in exchange for fees. *Id*. But Smith never had the ability to control MBSI's performance. *See Id*., ¶ 6. Under the TCA, Altisource agreed to jurisdiction in this Court. *Id*., ¶ 8.

### E.     Altisource withheld the $933,000 Earn-out Payment based on an alleged "condition" not found in the PSA and an improper set-off.

On December 15, 2015, Altisource sent Plaintiffs a letter enclosing the purported EOS for the First Period. (**Ex. 6**, "December 15th Letter"; *see also* **Ex. 7**). Altisource did not provide supporting documentation, as required under Section 2.5(c). Moreover, the specific "Earn-out Statement" it attached to its December 15,

2015 Letter was not as "contemplated" in Section 2.5(c) of the PSA. (Ex. 7). Altisource calculated "Adjusted Revenue" to be $11,844.395 for the First Period, which entitles Biscayne to an EOP of $933,000.[4] However, in addition to its "Adjusted Revenue" calculation, Altisource included in the EOS a section labeled "Actual vs. Budget – Year-to-Date October 31, 2015," which included items such as "Gross Margin," "Net Income," and "EBITDA." *Id*.

As Altisource explained in its December 15th Letter, Altisource claimed that no EOP is due for the First Period because "the Mortgage Builder business failed to 'operate within the guidelines of [the] annual budget,' which is a condition for any Measurement Period in which you are employed or engaged by Altisource . . . ." *Id*. The December 15th Letter continues, "[e]ven if you were entitled to an Earn-out Payment . . . we would be entitled to set-off against any such Earn-out Payment any damages you owe us due to breaches of the Agreement, such as failure to file all Tax Returns, as detailed in our letter dated August 7, 2015 (the "Mortgage Builder Tax Issue")." *Id*.  Altisource's August 7, 2015 letter asserted that Plaintiffs had breached Sections 2.1(e) and 3.5(a) of the PSA because there were errors (misplaced decimal points) in five out of approximately 174,000 informational returns that MBSI had filed with the IRS on behalf of MBSI's customers, which MBSI corrected within two days of receiving notice. (**Ex. 8**). For the reasons stated

---

[4] Altisource must provide the EOS for the Second Period by December 15, 2016.

in the Complaint, Plaintiffs do not have a duty to indemnify Altisource with regard to the "Mortgage Builder Tax Issue" and the demand for indemnification does not excuse Altisource from making the EOP that is due in any event.

### F.   Altisource confirmed that it would not revisit its positions.

Plaintiffs addressed the December 15th Letter a week later and demanded that Altisource reconsider. (**Ex. 9**). Altisource responded that it "maintains that the Earn-out Statement and positions articulated in our December 15, 2015 letter are correct and thus will not issue a revised Earn-out Statement." (**Ex. 10**).

On April 26, 2016, Plaintiffs sent Altisource a letter requesting that Altisource comply with its obligation to provide documentation supporting the EOS. (**Ex. 11**). Altisource never responded. Altisource's refusal to reconsider its decision to withhold the EOP left Plaintiffs with no choice but to initiate litigation to resolve Altisource's two alleged grounds for withholding the EOP and Altisource's failure to pay Plaintiffs the owing "Aged Receivables" and consulting fees under the TCA. (**Ex. 12**). As Plaintiffs made clear in their Complaint, they do not currently dispute the calculation of Adjusted Revenue because Altisource has failed to provide the documentation required under the PSA.  *Id.*

Plaintiffs determined that mediation at this stage would not be beneficial when Altisource refused to provide documents it agreed to provide as a condition of mediation, and the parties then agreed that Altisource's response to the

Complaint would be due on October 5, 2016. On October 4, 2016, Altisource provided a "Notice of Disagreement Deadline." (**Ex. 13**). Thus, Altisource implicitly concedes that Plaintiffs have not issued a "Notice of Disagreement."[5]

### G.     The Complaint does not dispute "Adjusted Revenue."

Plaintiff does not dispute the Adjusted Revenue calculation. Dkt. 4, ¶ 34. Counts I and II seek a determination that Altisource's excuses for withholding the EOP are improper under the PSA. Count III seeks a judicial declaration that Plaintiffs do not have any indemnity obligation to Altisource related to the Mortgage Builder Tax Issue. Dkt. 4, ¶ 78. Count IV seeks damages from Altisource's breach of the amendment to the PSA that entitled Smith to Aged Receivables. *Id*., ¶¶ 79-83. Count V seeks damages from Altisource's failure to pay Smith consulting fees under the TCA (pursuant to which Altisource agreed to this Court's jurisdiction). These claims do not fall within the arbitration provision.

### III.     <u>ARGUMENT</u>

### A.     The Court must carefully interpret the language of the PSA.

Arbitration is a matter of consent not coercion. *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp*., 559 U.S. 662, 681 (2010). A party cannot be required to submit

---

[5] Altisource cannot claim that prior letters constitute a "Notice of Disagreement" in view of the January amendment to Section 2.5(d) of the PSA under which the parties agreed to a revised process as to how the EOS would become "final." Altisource suggests that Plaintiffs have "bypassed" the dispute resolution provisions in the PSA, but for the reasons set forth in this Response and in the Complaint, that is not the case.

a dispute to arbitration unless it has agreed to do so. *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 78 (Del. 2006). "The policy that favors alternate dispute resolution mechanisms . . . does not trump basic principles of contract interpretation." *Delaware Parfi Holding AB v. Mirror Image Internet, Inc.,* 817 A.2d 149, 156 (Del. 2002). Accordingly, "[a] party cannot be forced to arbitrate the merits of a dispute . . . in the absence of a clear expression of such intent in a valid agreement." *Willie Gary, LLC,* 906 A.2d at 79.[6]

Courts apply standard rules of contract interpretation to make the substantive arbitrability determination.[7] The court first must determine whether the arbitration clause at issue is broad or narrow. *Medicis Pharmaceutical Corp.,* 2013 WL 4509652 at *4 (quoting *Parfi Holding AB,* 817 A.2d at 149). Then, the court must apply the provision to the asserted legal claim to determine whether the claim falls within the scope of the provision. *Id.* The PSA is governed by Delaware law. (Ex. 1, § 9.13). The court must effectuate the parties' intent. *Lorillard Tobacco Co. v. Am. Legacy Found.,* 903 A.2d 728, 739 (Del. 2006). The court must "read a contract as a whole" and "give each provision and term effect, so as not to render

---

[6] *See also Kuhn Const., Inc. v. Diamond State Port Corp.,* 990 A.2d 393, 396 (Del. 2010) ("We will not enforce a contract that unclearly or ambiguously reflects the intention to arbitrate."); *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 504 (2007) ("we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated.").

[7] There is no dispute that the Court should decide substantive arbitrability.

9

any part of the contract mere surplussage." *Osborn ex rel. Osborn v.* Kemp, 991

A.2d 1153, 1159 (Del. 2010). Delaware adheres to the "objective theory of

contracts," which means that a contract should be interpreted as it "would be

understood by an objective, reasonable third party." *Id.*

> **B.    Section 2.5 requires arbitration only of matters concerning the calculation of Adjusted Revenue and the corresponding EOP.**

The Court's analysis begins and ends with the language of the PSA, which

Altisource has largely overlooked. When viewed as a whole and in a way that

gives meaning to all of the provisions of Section 2.5, the PSA clearly evidences

that the parties intended to send only disputes concerning the calculation of

Adjusted Revenue and the corresponding EOP set forth in Annex III, not other

disputes, to arbitration. *See Preferred Landscape & Lighting, LLC v. Alban*, 2015

WL 9182581, at *3 (N.D. Ill. Dec. 17, 2015).[8]

First, the Court must consider the proper manner of determining the EOPs

under the PSA. Under Section 2.5, EOPs are calculated by determining "Adjusted

Revenue" according to the definition in the PSA and reviewing Annex II to

determine if an EOP is due. The PSA is clear – "in the event that the ***Adjusted***

---

[8] Stating, "[t]he Purchase Agreement provides a detailed description of how to calculate the EBITDA and provides that the arbitrator shall be an auditor from a certified public accounting firm. It is clear that the type of disagreement that the parties anticipated would be covered by the arbitration provision would, as the Purchase Agreement states, relate to the calculation of the EBITDA and nothing more."

*Revenue equals an amount set forth in the left-hand column* . . . then Seller *shall be entitled to* an aggregate Earn-out Payment equal to the amount set forth in the corresponding row in the right-hand column . . . ." (Ex. 1).

The Court must also consider the PSA's definition of "Earn-out Statement." Section 2.5(c) clearly defines "Earn-out Statement" as "a statement of the *Adjusted Revenue* during such Measurement Period, and if applicable, a statement *calculating* the Earn-out Payment payable with respect to such Measurement Period." *Id*. (emphasis added).  Reviewing the entirety of Section 2.5, including the repeated use of words and phrases like "financial review," "statement," "calculating" and "computations," it is clear that the EOS is directed to the accounting  necessary to determine Adjusted Revenue. Once Adjusted Revenue is calculated, determining the EOP is a matter of comparing Adjusted Revenue to Annex II. The PSA does *not* state that after calculation of Adjusted Revenue, Altisource may make deductions to the corresponding EOP as it saw fit.

The Court must consider the manner of calculating the EOP, because it affects the proper scope of the EOS and, in turn, the proper scope of the arbitration provision. To the extent that Plaintiffs disputed Altisource's *calculations*, Plaintiffs could specify such disputes in a "Notice of Disagreement with Earn-out Statement" and, if such disputes could not be resolved privately, the parties "shall submit to the Arbitrator for review and resolution any and all matters which remain in

11

dispute and *which were included in any Notice of Disagreement with Earn-out Statement* . . . ." *Id*. (emphasis added). Thus, it is only the specific disputes in a Notice of Disagreement with EOS that may be arbitrated. The language in Section 2.5 directing how the "calculation" of the earn-out Payments is to be made and defining the "Earn-out Statement" clearly indicate that the parties intended to arbitrate only disputes regarding the computations. The fact that the "Arbitrator" is Ernst & Young confirms the parties' intention. The parties' intentions are further underscored by the fact that the PSA provides for arbitration in only two, specific locations, both which deal with accounting (indeed, they require applying GAAP).

Altisource tries broaden the actual language of Section 2.5. For instance, Altisource suggests that "any disagreements *regarding* the Earn-out *Payment*" are arbitrable. Dkt. 7 at 3 (emphasis added). But the PSA does not say that all disputes "*regarding*" the Earn-out "*Payment*" shall be arbitrated. If the parties intended for the arbitration net to be so broad, they would have included different language.

This case is more analogous to *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1 (1st Cir. 2004) and *Hodges v. MedAssets Net Revenue Sys., LLC*, 2008 WL 476140, at *1 (N.D. Ga. Feb. 19, 2008) than to the cases Altisource cites.

In *Fit Tech,* the formula for computing the earn-out payment depended on EBITDA. *Id*. at 2-3. The purchase agreement set out procedures for calculating the amount. *Id*. The purchaser was required to provide the sellers with quarterly

reports setting forth the EBITDA calculation. *Id*. The purchase agreement then set out a process for dealing with disputes as to the schedules:

> (e) *Protest Notice*. Within sixty (60) days after delivery to the Sellers of the Advance Earn–Out Schedule or the Earn–Out Schedule, as applicable, the Sellers may deliver written notice (each, a "Protest Notice") to the Buyer of any objections, and the basis therefor, which the Sellers may have to the Advance Earn–Out Schedule or the Earn–Out Schedule, as applicable. Any such Protest Notice shall specify the basis for the objection, as well as the amount in dispute . . . .

> (f) *Resolution of the Sellers' Protest*. If the Buyer and the Sellers are unable to resolve any disagreement with respect to the Advance Earn–Out Schedule or the Earn–Out Schedule within twenty (20) days following the Buyer's receipt of any Protest Notice, then the items in dispute will be referred to the Accountants for final determination . . . .

*Id*. at *3. Just as the EOS in this case is for the purpose of calculating Adjusted Revenue and reporting the corresponding EOP, the "schedule" in *Fit Tech* was for the purpose of calculating and reporting "EBITDA," not other matters. The purchaser in *Fit Tech*, like Altisource, argued that allegations of "operational misconduct" could "alter the figures in the two schedules and reduce the pay-out," thus such allegations should be referred to the accountants. *Id*. at *8. The First Circuit rejected this argument:

> The phrase "any disagreement" refers to earning schedules ***whose components are defined in detail in the purchase agreement in accounting terms***: specifically, the EBITDA formula for earnings of the eight centers before certain other costs (e.g., interest, taxes, depreciation) are taken into account. And, the unresolved disagreements are to be referred to "accountants." In context, it therefore makes most sense to read "any disagreements" as referring to disagreements about accounting issues arising in the calculations that

13

underpin the schedules. [*Id*. at *8 (emphasis added)].

As with the "schedules" in *Fit Tech*, it is clear that the EOS in this case is to report "Adjusted Revenue" and, according to Annex II, the corresponding EOP. The formula for "Adjusted Revenue" is likewise cast in "accounting terms." It is equally clear here that the parties intended to send to arbitration before accountants at Ernst & Young, LLP only disagreements regarding accounting issues.

The court's analysis in *Hodges* is also instructive. *Hodges*, 2008 WL 476140 at *1. There, the purchase agreement stated that "the Buyer shall prepare and deliver to the Seller a schedule detailing the calculation of the Additional Consideration (the 'Earn–Out Schedule')." *Id*. at *4 (emphasis omitted). The agreement stated:

> If the Buyer gives the Seller notice of the objections to the Seller's Report, and if the Buyer and Seller are unable, within fifteen (15) days after receipt by the Seller of the notice by the Buyer of objection, to resolve the disputed exceptions, such disputed exceptions will be referred to an Independent Accounting Firm . . . . [*Id*. at *2].

According to the *Hodges* court, "the Resolution Clause in the APA requiring 'any dispute' to be submitted to an Independent Accounting Firm was intended by the parties only to encompass any dispute regarding the calculation of any additional consideration as determined by the Earn–Out." *Id*. at *4. In reaching its conclusion, the court looked at the provision as a whole: "reading Section 3.4 as a coherent whole, it is evident this section applies to disputes concerning the calculation of

14

sales—not whether the effort to generate them was insufficient to constitute the violation of an express or implied duty based on or arising from a contract." *Id*. In particular, the court's analysis took into account the definition of the "Earn-out Schedule," which was a "*schedule* detailing the *calculation* of the Additional Consideration." *Id*. (emphasis in original). According to the court, the provision "describes an accounting process involving detailed information schedules prepared for use in calculating the additional consideration to be paid." *Id*. The same reasoning applies here. Like in *Hodges*, the Court should consider the correct way of determining the EOP and the proper definition of EOS, which is plainly related to the accounting steps necessary to determine "Adjusted Revenue."

Here, like in *Hodges* and *Fit Tech*, the Court should reject Altisource's attempts to expand the arbitration provision to encompass disputes that the parties did not intend to arbitrate. Other cases, including cases from courts in the Sixth Circuit, that support this result.[9]

---

[9] *See, e.g., Costello v. Patterson Dental Supply, Inc.*, 2007 WL 1041128, at *5 (W.D. Mich. Apr. 5, 2007) (claims of breach of contract, breach of the covenant of good faith and fair dealing, and fraud were outside of an arbitration provision that applied to "dispute[s] involving the computation of the Earn Out.")*; T.R. McClure & Co., Inc. Liquidating Trust v. TMG Acquisition Co*., 1999 WL 692683, at *4-5 (E.D. Penn, Sept. 7, 1999) (language stating "[i]f the Seller Group Representative delivers a Notice of Objection to the determination of the Earn-out Payments . . . ." specifies "that only objections pertaining to 'the determination of the amount' (and not the conduct that underlies the mathematical determination) of the earn-out payments are subject to arbitration . . . ."); *Irving v. EBIX, Inc.*, 2010 WL 3168429, at *4 (S.D. Cal. Aug. 10, 2010) (language specifying review by an independent

**C.   Altisource is attempting to improperly enlarge the scope of the arbitration provision simply by including things in the Earn-out Statement that should not have been included.**

Though Section 2.5 sets out the *proper* methodology for determining the EOP (and therefore the proper scope of the EOS), Altisource is attempting to rewrite the contract by arguing that adherence to a particular "budget" is a ***condition precedent*** to payment of the Earn-out and that it is entitled to off-set amounts it unilaterally declared in an indemnification demand. Altisource thus infers that it was proper to include these matters in the EOS and that such matters should therefore be arbitrated simply because Altisource elected to put them in the EOS. But there is no support in the PSA for either of Altisource's arguments and neither claim is arbitrable. *Fit Tech, Inc.*, 374 F.3d at 8.

**1.   The "budget" issue is not arbitrable.**

There is no language in the PSA stating that adherence to a "budget" (including the specific financial indicators Altisource included in the EOS) is a condition, the failure of which excuses Altisource from paying an EOP

---

accountant if the parties are unable to agree on *"the amount of any Cash Merger Consideration or any Contingent Merger Consideration due"* does not indicate that the parties expected a breach of contract claim or bad faith conduct to be decided by an arbitrator.); *Preferred Landscape & Lighting, LLC v. Alban*, 2015 WL 9182581, at *3 (N.D. Ill. Dec. 17, 2015); *Senti v. Sanger Works Factory, Inc.*, 2007 WL 1174076, at *7 (M.D. Fla. Apr. 18, 2007) ("In this case, where the dispute resolution process utilizing an accountant is insufficient to resolve the dispute over complete non-payment of the Earn-Out or sale of the business, then § 3.3's accountant dispute-resolution mechanism does not apply.").

16

altogether.[10] A condition precedent is "[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises." *Seaford Assocs. Ltd. P'ship v. Subway Real Estate Corp.,* 2003 WL 21254847, at *5 n. 30 (Del. Ch. May 21, 2003). A term rendering performance by one party contingent upon a condition or performance of another is generally a condition precedent. *SLMSoft.Com, Inc. v. Cross Country Bank*, 2003 WL 1769770, at *12 (Del. Super. Ct. Apr. 2, 2003). Under Delaware law, conditions precedent "are not favored in contract interpretation because of their tendency to work a forfeiture." *Stoltz Realty Co. v. Paul,* 1995 WL 654152, at *9 (Del. Super. Sept. 20, 1995). Whether a condition is one precedent to performance by the other party is divined from the intent of the parties. *SLMSoft.Com, Inc.,* 2003 WL 1769770 at *12–13. "Although no particular words are necessary for the existence of a condition, such terms as 'if,' 'provided that,' 'on condition that,' or some other phrase that conditions performance usually connote an intent for a condition rather than a promise." *Id*. at *12. "While there is no requirement that such phrases be utilized, their absence is probative of the parties' intention that a promise be made rather than a condition imposed, so that the terms will be construed as a covenant." *Id*.

---

[10] It is not even logical for Altisource to suggest that "service revenue," "gross margin," "operating income," "pre-tax income" and "net income" needed to meet certain thresholds when the only "*Adjusted Revenue*" matters, under the PSA's language, for the purposes of determining whether an Earn-out Payment is due. These other financial measures Altisource has come up with are found literally nowhere in the PSA. The PSA does not define "budget" to include these things.

In this case, the PSA contains no words indicating that adherence to a "budget" is a condition to the payment of the EOP. Instead, the PSA is clear that if Adjusted Revenue equals an amount set forth in the left-hand column of Annex II, Seller "shall be entitled to" an EOP. (Ex. 1, § 2.5(a)(i)). Moreover, Section 2.5(a)(iii) provides specific Forfeiting Conditions, which do result in forfeiture of an Earn-out Payment, but which **do not include** adherence to a "budget." In particular, the provision concerning Forfeiting Conditions contains the exact type of conditional language that is conspicuously absent from Section 2.5(a)(ii). It states, "[n]otwithstanding anything to the contrary herein, (A) if a Forfeiting Condition occurs prior to or during the First Period, then Seller shall not be entitled to receive any Earn-out Payments with respect to the First Period . . . ." Unlike Section 2.5(a)(iii), there is nothing in Section 2.5(a)(ii) that makes payment of an Earn-out conditioned upon adherence to a "budget."[11] Because the budget condition is not a condition at all and has nothing to do with the calculation of Adjusted Revenue or the corresponding EOP, it was improper for Altisource to include it in the EOS. Altisource cannot sneak claims into arbitration in such a way, because it is completely contrary to the parties' intentions.

### 2.     The Mortgage Builder Tax Issue is not arbitrable.

---

[11] As set forth in the Complaint, Smith never had any operational control over the business such that he could control things like "gross margin," "operating income," "pretax income," or "net income."

Altisource's attempted set-off related to the Mortgage Builder Tax Issue likewise had no place in the letter accompanying the EOS, is not related to the EOP, and is not arbitrable. Counts I and II seek a determination that Altisource may not refuse to pay the EOP based on the "Mortgage Builder Tax Issue." Count III seeks a judicial declaration that Plaintiffs do not have any indemnity obligations to Altisource related to the Mortgage Builder Tax issue. Other than the fact that Altisource has unilaterally selected it as a basis for refusing to pay the EOP, the Mortgage Builder Tax Issue does not relate to Section 2.5. Altisource's argument as to why the issue should be referred to arbitration appears to be two-fold: 1) Altisource included it in the EOS; and 2) because Altisource claims a right of set-off of actual damages under Section 8.4 of the PSA, it is entitled to withhold the EOP. Both arguments are unavailing.

First, there is nothing in the PSA that states that all matters included in the EOS – whether properly or improperly included – shall be arbitrated. The proper scope of the EOS is clear from Section 2.5, and it does not allow Altisource to include any and all claims of breach or requests for indemnification in the EOS merely so it can arbitrate rather than litigate. Because the Mortgage Builder Tax Issue has precisely zero to do with the Earn-out provision, it is not arbitrable.

With regard to Altisource's second argument, Altisource has no right – whether under the PSA or the law – to set-off a non-existent liability against

something presently due to Biscayne. The PSA not provide this right to Altisource, and Delaware law forecloses it. "'A contingent or unmatured obligation which is not presently enforceable cannot be the subject of set-off . . . [T]here is no right to set-off of a possible unliquidated liability against a liquidated claim that is due and payable.'" *CanCan Dev., LLC v. Manno*, 2011 WL 4379064, at *5 (Del. Ch. Sept. 21, 2011); *Viacom Int'l, Inc. v. Winshall*, 2012 WL 3249620, at *18 (Del. Ch. Aug. 9, 2012) ("nothing in the Merger Agreement . . . suggests that indemnifiable losses must be offset against the Earn–Out before the Earn–Out is paid, and allowing Viacom to set off these amounts would be contrary to settled law.").

Again, the PSA does not provide that any and all claims arising under the PSA shall be resolved in arbitration. And Section 2.5 of the PSA cannot be read to encompass such claims. To accept Altisource's logic would mean that literally any claim Altisource could conjure up would be subject to arbitration if it elected to withhold an EOP on the basis of that claim. That result is not proper.

Both of the cases upon which Altisource relies – *PureWorks* and *Shy* (Dkt. 7 at 13-16) – are distinguishable when one examines the contractual language at issue and the facts of those cases.

In *PureWorks*, the "Earn-out Report" would become final unless the Seller delivered "written notice to Buyer of its disagreement as to ***any item*** included in the [Earn-out Report] . . . ." within a specified time. (**Ex. 14**, § 1.5(b), emphasis

20

added). The agreement further provided that "[t]he Accounting Firm shall be engaged jointly by the parties to decide the dispute **with respect to** the [Earn-out Report] . . . ." *Id.*, § 1.5(c). (**Ex. 15**, Complaint, ¶ 22). USS notified PureWorks that it disputed the revenue calculation of the earn-out report for the 2009 payment. *Id.* However, in its "Dispute Notice," USS did not just dispute the revenue calculation, but also added allegations that PureWorks intentionally altered and damaged the business to deprive USS of an earn-out. *Id.* The parties' contract required PureWorks to "operate and fund the [b]usiness with a view towards maximizing revenues (consistent with [Unique Software's] past practices)." *PureWorks, Inc. v. Unique Software Sols., Inc.*, 554 F. App'x 376, 377 (6th Cir. 2014).

The Court of Appeals affirmed the lower court's interpretation of the provision, but did so based on the particular contractual language, which is much broader than in this case. The court reasoned that "Sections 1.3(c)(v) and 1.5(c) of the purchase agreement provided **broadly** for arbitration of 'disputes **regarding** the [e]arn-out [r]eport . . . ." *Id.* at 378. Such broad language is not present here. The relevant provision in Section 2.5(f) refers to "differences which [the parties] may have with respect **to the matters specified in such Notice of Disagreement with Earn-out Statement**" that remain unresolved after a 30-day period. This language is not as broad or as encompassing as all disputes "regarding the [e]arn-out [r]eport," and must be read in conjunction with Section 2.5's discussion of

21

"Adjusted Revenue" and the definition of "Earn-out Statement."[12]

Shy is also distinguishable. Dkt. 7, p. 14. In Shy, the plaintiffs "alleg[ed] that the defendants had manipulated their corporate structure to avoid including certain amounts in the financial reports provided." Id. Navistar had an obligation to make yearly profit sharing payments to a Supplemental Benefit Plan ("SBC"). Shy v Navistar Int'l Corp, 781 F.3d 820, 822 (6th Cir. 2015). The methods for calculating Navistar's obligations were set forth in a Profit Sharing Plan. Id. The Plan required Navistar to report certain financial information necessary to confirm Navistar's compliance and a dispute resolution clause requiring disputes over the "information or calculation[s]" be referred to binding arbitration before an accountant. Id. at 823. The SBC disputed Navistar's classification of Medicare Part D subsidies in its calculations of its profit sharing obligations. Id. Ultimately, the SBC claimed that Navistar had manipulated its accounting anlaysis to eliminate profit sharing obligations. Id. at 824. The court held that "[d]isputes over how earnings, hours worked, and similar aspects of a business should be categorized for the purposes of an accounting analysis are disputes over 'information.'" Id. at 825. As the Court observed, the SBC dispted the categorization of various aspects of

---

[12] Judge Stranch's concurring opinion is noteworthy, as it indicates that the case presented a very "close question." Id. at 381–82. Judge Stranch emphasized that the relevant provision "[b]roadly assigns all 'disputes regarding the earn-out report' to arbitration, a phrase that supports an intention to include in the arbitration grant disputes over operational covenants underlying the earn-out report." The language in the PSA is not so broad.

Navistar's business in reports it provided under the Plan, and found that such disputes "directly concern the 'information' provided by Navistar pursuant to its obligations under Section 8." *Id*. In this case, the arbitration provision is not as broad as in *Shy*, which encompassed disputes concerning "*information or calculations*" that Navistar had to report. Not only is *Shy* distinguishable, the dissenting opinon by Judge Clay is compelling. *Id*. at 834.

As set forth above, neither *Pureworks* nor *Shy* is controlling or persuasive. Ultimately, each case turns, as it must under the applicable legal principles, on the precise contractual language and the nature of the claims asserted.

### D.   Altisource's contention that Counts IV and V are "within the scope of the arbitration agreement" is frivolous.

Altisource's claim that Counts IV and V are arbitrable because "Altisource may seek a set-off or counterclaim in the amount of its damages related to Plaintiffs' failure to properly file Tax Returns . . . ." is frivolous. Dkt. 7, p. 19.

As set forth above, Counts IV and V do not relate to the Earn-out provision in any manner.  Altisource relies on Section 8.4 of the PSA to try to sweep Counts IV and V into the narrow arbitration clause in Section 2.5.  Section 8.4 states: "in the event of a breach of any provision of this Agreement, each Purchaser shall have the right to set-off any money damages suffered by each Purchaser from any amounts otherwise payable by each Purchaser or their Affiliates to Seller or Owner . . . ." (Ex. 1, ¶ 8.4). However, there is nothing in the PSA stating that all claims of

23

breach or all claims for indemnification are subject to arbitration. And Altisource has not asserted any claim for damages, has not received a judgment awarding it any damages, and, as far as Plaintiffs are aware, has not actually suffered any damages. Altisource has no right – whether under the PSA or the law – to set-off a non-existent liability against something presently due to Biscayne. *CanCan Dev., LLC,* 2011 WL 4379064 at *5; *Viacom Int'l, Inc.*, 2012 WL 3249620 at *18. To allow Altisource to use Section 8.4 to enlarge Section 2.5's narrow arbitration provision to encompass virtually any claim Altisource may wish to arbitrate would be contrary to the PSA and the law.  In addition, Altisource's argument eviscerates the venue provision in the TCA.  Counts IV and V are plainly not arbitrable.

In *Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2nd Cir. 1995), a case Altisource cites, the court rejected the notion that because claims are alleged to be related to a single set of facts that they should be arbitrated regardless of what the contract says. As the court put it, "[t]he preeminent concern of Congress in passing the [Arbitration] act was to enforce private agreements . . . and that concern requires that we rigorously enforce agreements to arbitrate, even if the result is [piecemeal] litigation . . . ." *Id.*, citing *Byrd*, 470 U.S. at 221. "If some claims are non-arbitrable while others are arbitrable, then we will sever those claims subject to arbitration from those adjudicable only in court." *Id.*

**E.      The Court should not stay this action.**

24

Though the Court need not entertain whether a stay is proper because it should not refer any claims to arbitration, Altisource has not fairly addressed the issue of whether a stay is appropriate in the event the Court finds that there are both arbitrable and non-arbitrable claims. Dkt. 7 at 19 n.6 and 20. The FAA allows concurrent litigation where only some of the issues are arbitrable and others are not. *Byrd*, 470 U.S. at 221-225 (1985) (as Justice White stated in concurrence, the "heavy presumption should be that the arbitration and the lawsuit will each proceed in its normal course"). Thus, "[C]ourts generally refuse to stay proceedings of nonarbitrable claims when it is feasible to proceed with the litigation." *Klay v. All Defendants,* 389 F.3d 1191, 1204 (11th Cir. 2004). Altisource has not provided any reason why litigation could not proceed in the event the court determines there are arbitrable and non-arbitrable claims.

## IV.   CONCLUSION

Plaintiffs respectfully request that the Court deny Altisource's Motion.

Respectfully submitted:

DICKINSON WRIGHT PLLC

By: /s/    *Edward H. Pappas*
Edward H. Pappas (23224)
2600 W. Big Beaver Road, Suite 300
Troy, Michigan 48048
(248) 433-7200
epappas@dickinsonwright.com

Date: October 24, 2016                    *Attorneys for Plaintiff*

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 24, 2016, I caused the foregoing to be electronically filed with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

DICKINSON WRIGHT PLLC

By: <u>/s/    *Erin M. Pawlowski*</u>
Edward H. Pappas (23224)
Daniel D. Quick (48109)
Erin M. Pawlowski (P74305)
2600 W. Big Beaver Road, Suite 300
Troy, Michigan 48048
(248) 433-7200
epappas@dickinsonwright.com
dquick@dickinsonwright.com
epawlowski@dickinsonwright.com

*Attorneys for Plaintiff*

26