UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVEN M. SMITH *et al.*,

    Plaintiffs,

v.

Case No. 16-cv-11503
Hon. Matthew F. Leitman

ALTISOURCE SOLUTIONS S.À R.L. *et al.*,

    Defendants.

_____/

# OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY THIS PROCEEDING (ECF #7)

In 2014, Plaintiffs Keven Smith ("Smith") and Biscayne and Associates, Inc.[1], ("Biscayne") entered into a purchase and sale agreement (the "Agreement") with Defendants Altisource Solutions S.À.R.L. and Altisource Solutions, Inc. (collectively, "Altisource"). Under the Agreement, Altisource acquired the assets of a mortgage origination and software servicing business (the "Acquired Business") from Biscayne. The Agreement required Altisource to pay Biscayne a base purchase price at closing and to make additional post-closing payments if certain conditions were satisfied (the "Earn-out Payments"). In this action, Biscayne and Smith

---

[1] Biscayne and Associates, Inc. was formerly known as Mortgage Builder Software, Inc.

1

(Biscayne's owner) seek, among other things, a declaratory judgment that Altisource wrongly refused to make the first Earn-out Payment due under the Agreement.

Altisource has now filed a Motion to Compel Arbitration and Stay This Proceeding (the "Motion"). (*See* ECF #7). In the Motion, Altisource contends that Smith and Biscayne are required to arbitrate all of their claims pursuant to an arbitration provision in the Agreement. For the reasons explained below, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

# I

## A

On July 18, 2014 (the "Closing Date"), the parties entered into two contracts. First, they executed the Agreement under which Biscayne sold substantially all the assets of the Acquired Business to Altisource. Second, Smith entered into an employment agreement (the "Employment Agreement") with Altisource to perform certain services to support the Acquired Business. (*See* Employment Agreement, ECF #11-5.) Within a year after the Closing Date, the parties terminated the Employment Agreement, and Smith became a consultant to Altisource under a separate "Transition and Consulting Agreement" (the "Consulting Agreement"). (*See* Consulting Agreement, ECF #11-6.)

**B**

The Agreement required Altisource to make a payment of approximately $15 million at closing and to make three future Earn-out Payments (up to a maximum of $7 million) if certain conditions were satisfied at the end of three future Measurement Periods.[2] (*See* Am. Compl. at ¶1, ECF#4 at Pg. ID 448-49.) Section 2.5 of the Agreement governs Altisource's obligation to make the Earn-out Payments. In relevant part, that Section provides:

> (a) [Biscayne] may be entitled to receive additional contingent payments (collectively, the Earn-out Payments") in the manner described in this Section 2.5. The Earn-out Payments shall be calculated as follows:
>
>> (i) As further described in this Section 2.5, following the end of each Measurement Period, [Altisource] shall calculate the Adjusted Revenue during such Measurement Period. With respect to those Measurement Periods set forth on Annex II, in the event that the Adjusted Revenue equals an amount set forth in the left-hand column of the chart attached hereto as Annex II, then [Biscayne] shall be entitled to an aggregate Earn-out Payment equal to the amount set forth in the corresponding row in the right-hand column of the chart. . . . The Parties acknowledge and agree that under no circumstance shall the aggregate amount of the Earn-out Payments paid or payable hereunder exceed Seven Million Dollars ($7,000,000).

---

[2] There are three "Measurement Periods": "First Period," "Second Period," and "Third Period." (Agreement Annex II, ECF #1-2 at Pg. ID 95.) The Parties do not dispute that the First Period commenced on November 1, 2014, and ended on October 31, 2015. (*See* Earn-out Statement, ECF #11-8 at Pg. ID 607.)

3

> (ii) During each Measurement Period, to the extent [Smith] is employed or engaged by [Altisource] to perform services, (A) [Smith] shall ensure his services are performed in good faith and in the best interest of [Altisource], including operating the Acquired Business within the guidelines of an annual budget approved by [Altisource] . . . .
>
> (iii) Notwithstanding anything to the contrary herein, (A) if a Forfeiting Condition[3] occurs prior to or during the First Period, then [Biscayne] is not entitled to receive any Earn-out Payments with respect to the First Period, Second Period, or Third Period….

(Agreement §2.5, ECF #1-2 at Pg. ID 33-34.)

Sections 2.5(c)-(f) of the Agreement set forth a detailed process for (1) communicating about an Earn-out Payment (if any) due at the end of a Measurement Period and (2) resolving certain disputes between the parties related to an Earn-out Payment. (*See* Agreement §§ 2.5(c)-(f), ECF #1-2 at Pg. ID 33-34.) This process is best understood when separated into the following six steps:

> **Step One** – Altisource prepares an "Earn-out Statement," which has two components: a statement of Adjusted Revenue and, if applicable, a statement "calculating" the Earn-out Payment due based upon that revenue. (Agreement §2.5(c), ECF #1-2 at Pg. ID 34.)

---

[3] A "Forfeiting Condition" occurs if Smith resigns or is terminated "for Cause (as such term is defined in [Smith's] Employment Agreement)." (Agreement Annex I at §58, ECF #1-2 at Pg. ID 85.)

**Step Two** – Altisource delivers to Biscayne the Earn-out Statement together with underlying computations and supporting documents. (*See id.*)

**Step Three** – Biscayne, along with its accountants and lawyers, have thirty days to review the Earn-out Statement and supporting work papers. (*See id.*)

**Step Four** – If Biscayne disagrees with the Earn-out Statement, it must deliver a "Notice of Disagreement with Earn-out Statement" to Altisource (explaining the nature of its disagreement) within the thirty-day review period. (Agreement §2.5(d), ECF #2-1 at Pg. ID 34.)

**Step Five** – If Biscayne delivers a Notice of Disagreement with Earn-out Statement, the parties must spend the next thirty days seeking to resolve in writing the issues identified in the notice. (*See* Agreement §2.5(f), ECF #2-1 at Pg. ID 34.)

**Step Six** – If the parties have not resolved the issues identified in the notice within the thirty-day time period, they shall submit the issues to the designated arbitrator for binding resolution. The designated arbitrator is the Boston office of Ernst & Young LLP. (*See id.*; Agreement Annex I §12, ECF #1-2 at 57, referencing definition of Arbitrator in Section 2.4(c) of Agreement.)

## C

On December 15, 2015, Altisource delivered to Plaintiffs the Earn-out Statement for the First Measurement Period (the "First Earn-out Statement"). (*See* Earn-out Statement Cover Letter, ECF #11-7 at Pg. ID 605.) According to the First Earn-out Statement, Altisource had an Adjusted Revenue of $11,844,395. (*See* Earn-out Statement Spreadsheet, ECF #11-8 at Pg. ID 608.) Under Annex II of the Agreement, that level of Adjusted Revenue entitled to Biscayne to a first Earn-out Payment of $933,000. (*See* Agreement Annex II, ECF #1-2 at Pg. ID 95.)

But Altisource declined to make that payment. In a cover letter accompanying the First Earn-out Statement, Altisource contended that it was not required to make the first Earn-out Payment because Smith, in his capacity as employee and consultant, had failed to satisfy the "condition[] in the Agreement" that required him to "operate the Acquired Business within the guidelines of [the] annual budget." (Earn-out Statement Cover Letter, ECF #11-7 at Pg. ID 605.) Altisource further asserted that even if Biscayne was "entitled to an Earn-out Payment for the First Measurement Period, [Altisource] would be entitled to set-off against any such Earn-out Payment any damages [Biscayne] owe[s] [Altisource] due to breaches of the Agreement, such as the failure to file all Tax Returns, as detailed in [Altisource's] letter dated August 7, 2015."[4] (ECF #11-7 at Pg. ID 605.) Altisource said that its right to a set-off warranted its refusal to make the first Earn-out Payment because its claimed set-off exceeded any Earn-out Payment to which Biscayne could possibly be entitled. (*See id.*)

One week after receiving the First Earn-out Statement, Plaintiffs sent Altisource a letter objecting to Altisource's assertions. (*See* ECF #7-2 at Pg. ID 508-09.) Plaintiffs wrote that Altisource's position with respect to Smith's alleged non-

---

[4] In the August 7, 2015, letter, Altisource asserted that Plaintiffs had breached Section 2.1(e) and Section 3.5(a) of the Agreement when they failed to file timely tax returns on behalf of the Acquired Business' clients prior to the Closing Date. (*See* August 7, 2015 Letter, ECF #11-9.) For the alleged breach, Altisource sought indemnification in the amount of $10,502,340. (*See id.*)

6

compliance with the budget was "inappropriate" because "Smith was denied any operational control or information about what was happening within [Altisource]" and because Altisource's calculations relied on inappropriate criteria.[5] (*Id.*) Plaintiffs added that they "object[ed] to all claims for which [Altisource is] claiming a setoff."[6] (*Id.*) Plaintiffs concluded their letter by warning that if Altisource did not revise its position and make the first Earn-out Payment, Plaintiffs would "be required to issue a Notice of Disagreement with Earn-Out Statement" under the Agreement's dispute resolution provisions. (*Id.*)

Throughout early 2016, the parties attempted to informally resolve the Budget Compliance Dispute and the Tax Set-off Dispute, but they were not able to do so. Plaintiffs filed this action on April 26, 2016.[7] (*See* Compl., ECF #1.) Plaintiffs later filed an Amended Complaint on August 15, 2016. (*See* Am. Compl., ECF #4.)

---

[5] For ease of reference, the Court will use the term "Budget Compliance Dispute" to refer to the parties' disagreement over (1) whether Smith breached any obligation to comply with the budget and (2) whether that alleged non-compliance with the budget extinguished Altisource's obligation to make an Earn-out Payment.

[6] The Court will use the term "Tax Set-off Dispute" to refer to the parties' disagreement over (1) whether Biscayne has any liability for failing to file tax returns prior to the Closing Date and (2) if so, whether Altisource may set-off that liability against any Earn-out Payment to which Biscayne is entitled.

[7] As noted above, Plaintiffs previously told Altisource that they would file a Notice of Disagreement with Earn-out Statement. In the end, Plaintiffs did not deliver such a notice because, after giving the matter further consideration, Plaintiffs decided that, in their opinion, (1) the Budget Compliance Dispute and Tax Set-off Dispute did not

7

**D**

The Amended Complaint contains five counts. Three of the counts relate to whether Altisource owes the Earn-out Payment for the First Measurement Period. (*Id.*) The remaining counts relate to other matters.

Count One seeks "a judicial declaration that neither the [Budget Compliance Dispute] nor the [Tax Set-off Dispute] excuse Altisource's refusal to pay [an] Earn-out Payment pursuant to the terms of the [Agreement]." (*Id.* at ¶¶ 57-64, ECF #4 at Pg. ID 466-67.)

Count Two seeks $933,000 in damages because "Altisource repudiated and breached the [Agreement] by stating, clearly and unequivocally, that it would not pay an Earn-out Payment to Biscayne under any circumstance." (*Id.* at ¶¶65-69, ECF #4 at Pg. ID 468.)

Count Three seeks "a judicial declaration that Plaintiffs do not have any indemnity obligation to Altisource related to the [Tax Set-off Dispute] pursuant to the terms of the [Agreement]." (*Id.* at ¶¶ 70-78, ECF #4 at Pg. ID 468-70.)

Count Four alleges that Altisource breached a March 2015 amendment (the "2015 Amendment") to the Agreement that granted Plaintiffs certain rights in "Aged

---

fall within the Agreement's dispute resolution provisions and, thus, (2) they could proceed directly to litigation without filing the notice and without arbitrating those disputes.

8

Receivables" that Altisource collected. (*Id.* at ¶ 20, 79-83, ECF #4 at Pg. ID 453, 470-71.)

Count Five alleges that Altisource breached the Consulting Agreement that it entered into with Smith "by failing to pay Smith the required $3000 per month fee." (*Id.* at ¶¶ 84-88, ECF #4 at Pg. ID 471-72.)

E

On October 5, 2016, Altisource filed the Motion. (*See* ECF #7.) Altisource asks the Court to compel Plaintiffs to arbitrate all of the claims in the Amended Complaint and to stay this proceeding. (*See id.*) Plaintiffs responded to the Motion on October 24, 2016. (*See* ECF #11.) Altisource filed a reply on November 3, 2016. (*See* ECF #13.) The Court held a hearing on the Motion on January 5, 2017.

II

A

The Federal Arbitration Act ("FAA") governs arbitration provisions in contracts, like the Agreement, "that involve interstate commerce." *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528 (1995). "The FAA applies even when the agreement [to arbitrate] is limited to a particular class of disputes." *Shy v. Navistar Int'l Corp*, 781 F.3d 820, 825 (6th Cir. 2015).

Under Section 2 of the FAA, a "written [contractual] provision" that provides for "settle[ment] by arbitration [of] a controversy thereafter arising out of such

9

contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. §2. The FAA reflects "both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotations marks and citations omitted). Thus, "in applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the [FAA], due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself [are to be] resolved in favor of arbitration." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 475-76 (1989); *see also Nestle Waters N. Am. Inc. v. Bollman*, 505 F.3d 498, 503 (6th Cir. 2007) ("We examine arbitration language in a contract in light of a strong federal policy in favor of arbitration, resolving any doubts as to the parties' intentions in favor of arbitration.").

However, "arbitration under the [FAA] is a matter of consent, not coercion." *Volt*, 489 U.S. at 479. "While ambiguities in the language of the agreement should be resolved in favor of arbitration, [the Court] [will] not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002). Put differently, a court should decline to compel

10

arbitration of a dispute if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Teamsters Local Union 480 v. United Parcel Service, Inc.*, 748 F.3d 281, 288 (6th Cir. 2014) (quoting *AT&T Technologies, Inc. v. Communication Workers of America*, 475 U.S. 643, 650 (1986)).

**B**

The Court will compel arbitration of the Budget Compliance Dispute because it cannot say "with positive assurance" that the dispute falls outside of the Agreement's arbitration provision. *Teamsters*, 748 F.3d at 288. As explained below, there is an ambiguity in the Agreement concerning whether the parties must arbitrate the Budget Compliance Dispute, and that ambiguity requires the Court to order arbitration.

Plaintiffs contend that (1) the Agreement requires the parties to arbitrate "only disputes concerning the calculation of Adjusted Revenue and the corresponding [Earn-out Payment]" and (2) the Budget Compliance Dispute is not subject to arbitration because it relates to "operational" issues, not the calculation of Adjusted Revenue and the Earn-out Payment. (Pl.'s Resp., ECF #11 at Pg. ID 542-50.) Plaintiffs' multi-step argument is as follows:

1. The only disputes subject to arbitration are those "specified in [a] Notice of Disagreement with Earn-out Statement." (Agreement §2.5(f), ECF #1-2 at Pg. ID 35.)

11

2. The Agreement defines an Earn-out Statement as "a statement *calculating* the Earn-out Payment." (Agreement §2.5(c), ECF #1-2 at Pg. ID 34, emphasis added.)

3. Because an Earn-out Statement does nothing more than reflect a "calculation" of the Earn-out Payment, the only disputes that may be "specified" in a Notice of Disagreement with Earn-Out Statement (and later sent to arbitration) are those relating to the "calculation" of the Earn-out Payment.

4. The "calculation" of the Earn-out Payment involves only two steps: (1) the calculation of Adjusted Revenue and (2) a determination of whether that revenue corresponds to an Earn-out Payment listed on Annex II of the Agreement. (Agreement §2.5(a)(i), ECF #1-2 at Pg. ID 34.)

5. Therefore, the only issues subject to arbitration are those that relate to the calculation of Adjusted Revenue and whether the Adjusted Revenue corresponds to an Earn-out Payment listed on Annex II.

6. Since the Budget Compliance Dispute does not relate to the calculation of Adjusted Revenue and the corresponding Earn-out Payment, it is not subject to arbitration.

The Court agrees with Plaintiffs that the Agreement requires the parties to arbitrate only disputes concerning the "calculation" of the Earn-out Payments. The problem for Plaintiffs, however, is that the Agreement contains language suggesting that the "calculation" of the Earn-out Payment may involve more than merely comparing the mathematical tabulation of Adjusted Revenue to a corresponding column on Annex II. Indeed, there is language indicating that the "calculation" of the Earn-out Payment may include a consideration of whether Smith has fulfilled several of his contractual obligations. More specifically, Section 2.5(a) begins by

stating that "[t]he Earn-out Payments shall be *calculated as follows*:" (Agreement §2.5(a), ECF #1-2 at Pg. ID 34, emphasis added), and one of the immediately following subsections, 2.5(a)(ii), refers to Smith's obligations to, among other things, operate the Acquired Business in compliance with an annual budget approved by Altisource.[8] The listing of Smith's budget compliance obligations under the section concerning the "calculation" of the Earn-out Payments creates an ambiguity as to whether the required "calculation" includes an assessment of Smith's fulfillment of his budget compliance obligation. That ambiguity requires the Court to compel arbitration of the Budget Compliance Dispute.[9]

---

[8] In relevant part, Sub-Section 2.5(a)(ii) provides as follows: "During each Measurement Period, to the extent [Smith] is employed or engaged by [Altisource] to perform services, (A) [Smith] shall ensure his services are performed in good faith and in the best interest of [Altisource], including operating the Acquired Business within the guidelines of an annual budget approved by [Altisource]. . .." (Agreement §2.5(a)(ii), ECF #1-2 at Pg. ID 33.)

[9] Plaintiffs argue that the Agreement, as a whole, cannot be read to condition Plaintiffs' right to the Earn-out Payment upon Smith's compliance with the budget. Plaintiffs note that the Agreement contains specific Forfeiting Conditions, the occurrence of which relieves Altisource from its obligation to make an Earn-out Payment, and Plaintiffs stress that non-compliance with the budget is not such a condition. (*See* Pl.'s Resp., ECF #11 at Pg. ID 550.) Plaintiffs' reading of the Agreement may well be correct (and, candidly, appears to be the better reading of the Agreement), but the Court cannot say that the plain language of the Agreement compels their reading. Simply put, the Agreement lacks precision with respect to the "calculation" of the Earn-out Payments, and that lack of precision is what compels the Court to order arbitration.

As further support for their argument that the Budget Compliance Dispute is not subject to arbitration, Plaintiffs highlight that the dispute resolution provisions of the Agreement "repeated[ly]" use "words and phrases like 'financial review,' 'statement,' 'calculating,' and 'computations.'" (Pl's Resp., ECF #11 at Pg. ID 543.) According to Plaintiffs, the use of these words underscores that the Agreement's arbitration provision covers only disputes related to the mathematical/accounting calculation of Adjusted Revenue, not operational disagreements like the Budget Compliance Dispute. (*See id.*)

But the dispute resolution provisions also include language indicating that the process may address more than mathematical/accounting issues related to Adjusted Revenue. For instance, the provisions authorize Plaintiffs' "legal counsel" to review materials relating to Altisource's determination of the Earn-out Payment, (Agreement §2.5(c), ECF #1-2 at Pg. ID 34), and the involvement of counsel arguably suggests a process that involves more than just a mathematical review of Adjusted Revenue. Likewise, the dispute resolution provisions authorize Plaintiffs to interview Altisource's personnel as part of the Earn-out Payment inquiry, (*see id.*), and that, too, arguably suggests that the dispute resolution process – including arbitration – is not limited to mathematical/accounting tabulations. Simply put, the Court is not persuaded that the references to mathematical and accounting terms in

the dispute resolution provisions compel the conclusion that those provisions are limited to the mathematical/accounting calculation of Adjusted Revenue.

Finally, Plaintiffs stress that the parties' choice of arbitrator – the accounting firm Ernst & Young – confirms that they intended to limit arbitration to matters concerning the mathematical calculation of Adjusted Revenue. (Pl.'s Resp., ECF #11 at Pg. ID 544.) Plaintiffs note that, as accountants, the arbitrators would not be suited to address operational and other non-mathematical disputes, and thus it would not make sense to conclude that the parties intended to submit those matters to the arbitrators. (*See id.*) While there is certainly merit in this argument – indeed, it has been accepted by the United States Court of Appeals for the First Circuit,[10] – the United States Court of Appeals for the Sixth Circuit has rejected the notion that the choice of accountants as arbitrators compels the conclusion that the parties intended to arbitrate only accounting/mathematical issues. *See PureWorks Inc. v. Unique Software Solutions, Inc.,* 554 Fed. App'x 376, 379 (6th Cir. 2014) ("[T]he fact that the parties have selected an accountant as their arbitrator does not foreclose the arbitrability of operational disputes.").

In sum, for all of the reasons explained above, the Court concludes that the Agreement is ambiguous with respect to whether the parties must arbitrate the

---

[10] *See Fit Tech, Inc. v. Bally Total Fitness Holding Corp.,* 374 F.3d 1, 8 (1st Cir. 2004).

Budget Compliance Dispute, and, in light of that ambiguity, the Court must compel the parties to arbitrate that dispute.[11] The Court's conclusion is consistent with the most relevant Sixth Circuit decisions affirming orders compelling parties to arbitrate similar disputes under similar arbitration provisions. *See Shy v. Navistar Intern. Corp*, 781 F.3d 820, 827 (6th Cir. 2015); *PureWorks,* 554 Fed. App'x at 379.

## C

The Court will not compel the parties to arbitrate the Tax Set-off Dispute. As noted above, the Court shares Plaintiffs' view that the Agreement's arbitration provision requires the parties to arbitrate only disputes relating to the "calculation" of the Earn-out Payments (as the parties used that term in the Agreement), and the Tax Set-off Dispute does not even arguably relate to that "calculation." No aspect of the Tax Set-off Dispute relates in any way to the manner in which the Earn-out Payments are "calculated" under the Agreement. Instead, the premise of the Tax Set-off Dispute is that – wholly apart from the "calculation" of the Earn-out Payment

---

[11] Notably, Plaintiffs once appeared to believe that the Budget Compliance Dispute *was* subject to the Agreement's dispute resolution provisions, including the arbitration provision. In their letter dated December 22, 2015, Plaintiffs warned Altisource that if it did not change its position regarding the Budget Compliance Dispute, they (Plaintiffs) would initiate the Agreement's dispute resolution process by sending Altisource a Notice of Disagreement with Earn-out Statement, as required by Section 2.5(d) of the Agreement. (See ECF #7-2 at Pg. ID 508-09.) While Plaintiffs have now changed their mind concerning whether the Budget Compliance Dispute is subject to arbitration, their initial position on this issue is further evidence that the Agreement is ambiguous with respect to whether the Budget Compliance Dispute is subject to arbitration.

– Altisource need not make the Earn-out Payment because Plaintiffs' debt to Altisource exceeds the Earn-out Payment. Because the tax set-off claimed by Altisource and the "calculation" of the Earn-out Payments are entirely independent of one another, the Tax Set-off Dispute is not subject to arbitration.

**D**

The Court will not compel the parties to arbitrate Plaintiffs' claims in Counts Four and Five of the Amended Complaint. Count Four concerns Plaintiffs' rights in Aged Receivables, and Count Five seeks payments under the Consulting Agreement. Neither even arguably relates to the "calculation" of the Earn-out Payments (as that term in used in the Agreement), and thus neither is subject to arbitration.

**III**

In the Motion, Altisource asks the Court to stay all of Plaintiffs' claims pending arbitration. (*See* Motion, ECF #7 at Pg. ID 504.) The Court will stay the claims that it is compelling the parties to arbitrate but will not stay the remaining claims.

The FAA provides that that when a valid arbitration agreement requires the parties to submit a dispute to arbitration, a federal court shall "on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. This provision of the FAA requires the Court to stay proceedings on the claims that it is sending to

17

arbitration – i.e., Counts One and Two of the Amended Complaint to the extent that they rest upon the Budget Compliance Dispute. *See Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987).

But the Court will not stay proceedings on the remaining claims that it has determined are not subject to arbitration. The question of whether to stay litigation of Plaintiffs' non-arbitrable claims is left to the Court as a matter of "discretion to control its docket." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n. 23 (1983); *see also*, *Volkswagen of America Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966 (7th Cir. 2007), *Klay v. Pacificare Health Sys., Inc.*, 389 F.3d 1191, 1204 (11th Cir. 2004); *Spartech CMD, LLC v. International Automotive Components Group North America, Inc.*, 2009 WL 440905 at *12-13 (E.D. Mich. February 23, 2009). "[C]ourts generally refuse to stay proceedings of non-arbitrable claims when it is feasible to proceed with the litigation." *Klay*, 389 F.3d at 1204 (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 225 (White, J., concurring) (noting that the "heavy presumption should be that the arbitration and the lawsuit will each proceed in its normal course")). Here, it is feasible to proceed with litigation on the non-arbitrable claims while the parties arbitrate the other claims. While there is some overlap between the two sets of claims, the claims involve different subjects and different evidence, and the Court believes that the parties can proceed in both forums – here and in arbitration – without substantial overlap in

effort and without sacrificing efficiency. Accordingly, the Court will not stay the claims that remain here to be litigated.

## IV

For the reasons state above, the Motion is **GRANTED IN PART** and **DENIED IN PART** as follows:

- The Court **GRANTS** the Motion with respect to the claims in Counts One and Two of the Amended Complaint to the extent that such claims rest upon the Budget Compliance Dispute, as defined by the Court above. The parties are directed to arbitrate the claims in Counts One and Two to the extent that they rest upon the Budget Compliance Dispute. The claims in Counts One and Two are stayed pending the completion of arbitration to the extent that such claims rest upon the Budget Compliance Dispute.

- In all other respects, the Motion is **DENIED.**

**IT IS SO ORDERED.**

                                        s/Matthew F. Leitman
                                        MATTHEW F. LEITMAN
Dated: April 18, 2017            UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 18, 2017, by electronic means and/or ordinary mail.

                                                        s/Holly A. Monda  
                                                        Case Manager  
                                                        (313) 234-5113